14-1485-pr
*Chrysler v. Guiney*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

August Term 2014

(Argued: February 11, 2015      Decided: November 19, 2015)

No. 14-1485-pr

————————————————————

GREGORY CHRYSLER,

*Petitioner-Appellant,*


-v.-


G. GUINEY,

ACTING SUPERINTENDENT, FIVE POINTS CORRECTIONAL FACILITY,

*Respondent-Appellee.*

————————————————————

Before:      KEARSE, LIVINGSTON, and CARNEY, *Circuit Judges.*


Petitioner-Appellant Gregory Chrysler appeals from a March 31, 2014 judgment of the United States District Court for the Southern District of New York (Karas, *J.*) denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Chrysler claims that he was denied his Sixth Amendment right to effective assistance of counsel when, on direct appeal of his convictions for murder and conspiracy, his attorneys failed to argue that the admission at trial of his co-defendant's grand jury testimony violated the Confrontation Clause.  A New York appellate court previously rejected this claim, and we conclude that its decision was not "contrary to," and did not "involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme

1

Court of the United States."  28 U.S.C. § 2254(d)(1).  Accordingly, we affirm the judgment of the district court.

AFFIRMED.

MICHAEL H. SUSSMAN, Sussman & Watkins, Goshen, NY, *for Petitioner-Appellant*.

ANDREW R. KASS, Executive Assistant District Attorney, *for* David M. Hoovler, District Attorney of Orange County, Middletown, NY, *for Respondent-Appellee*.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

In July 2000, an Orange County, New York jury returned a verdict convicting Petitioner-Appellant Gregory Chrysler ("Chrysler") of second-degree murder, second-degree conspiracy to commit second-degree murder, and fifth-degree conspiracy to possess marijuana.  The state trial court (Berry, *J.*) denied Chrysler's motion to set aside the verdict and sentenced him for each conviction to concurrent prison terms of twenty-five years to life, eight-and-a-third to twenty-five years, and one year, respectively.  The New York Appellate Division, Second Department, affirmed Chrysler's conviction in December 2004, and the New York Court of Appeals denied Chrysler's application for leave to appeal in February 2005.  Chrysler then filed a motion to vacate the judgment, which was

denied, as was his application for leave to appeal that decision. In October 2006, Chrysler filed a coram nobis petition, arguing for the first time that he was denied the effective assistance of counsel when his attorneys failed to argue on direct appeal that the admission at trial of co-defendant Lawrence Weygant's ("Weygant") grand jury testimony violated Chrysler's rights under the Confrontation Clause. The Second Department denied Chrysler's coram nobis petition in February 2007, and the New York Court of Appeals denied leave to appeal in June 2007.

Chrysler then filed a petition for a writ of habeas corpus in the United States District Court for the Western District of New York. The petition was transferred to the Southern District of New York, and in a March 31, 2014, Opinion and Order, the district court (Karas, *J.*) denied Chrysler's petition while granting a certificate of appealability "on the specific issue of whether Petitioner's right to the effective assistance of appellate counsel was violated" by his attorneys' failure on direct appeal to raise a Confrontation Clause claim based on Weygant's testimony "in a way that would have allowed the Court to decide whether Petitioner's Confrontation Clause rights were violated." *Chrysler v. Guiney*, 14 F. Supp. 3d 418, 462 (S.D.N.Y. 2014). Chrysler does not dispute that

3

the Second Department addressed this claim on the merits in denying his coram nobis petition. Because that decision was not "contrary to," and did not "involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), we affirm the district court's denial of Chrysler's habeas petition.

## BACKGROUND

**A. Dominick Pendino's Murder and the Case Against Chrysler**

Chrysler was a marijuana dealer who operated in and around Newburgh, New York. Dominick Pendino ("Pendino"), a Newburgh resident and the homicide victim, was Chrysler's associate. In late August 1998, Chrysler and his wife Elizabeth were arrested for felony marijuana possession based, in part, on assistance provided by Michael Ronsini ("Ronsini"), an informant who had purchased marijuana from Chrysler in the past, and who was secretly cooperating with police.[1] Evidence at trial established that Chrysler came to suspect (erroneously) that it was *Pendino* who had informed on him. The

---

[1] Chrysler ultimately pleaded guilty in connection with this arrest on April 28, 1999, and was sentenced on September 1, 1999, to one to four years in state prison. His wife, also charged, pleaded guilty to criminal possession of marijuana in the fourth degree and was sentenced to a one-year conditional discharge.

4

evidence also established that Chrysler and Weygant murdered Pendino in retaliation.

The murder took place on the morning of March 3, 1999, some six months after Chrysler's arrest on the marijuana charge, and prior to his guilty plea in connection with that offense. At about 5:25 a.m. that day, Pendino's wife Cynthia woke him up because he was running late for work. Pendino was a cook at the Newburgh Auto Auction; according to his wife's trial testimony, he "never missed work." Tr. 518-19.[2] Cynthia Pendino testified that her husband showered, got dressed in his work uniform, and kissed her good-bye, after which she went back to sleep.

Pendino never arrived at the Auto Auction. A little after 6:00 a.m., his wife got a call from his work asking where he was. She assured the caller that he would be there soon and went back to sleep. About an hour later, however, she received another call saying that Pendino still had not arrived. At this point, she saw that his car was still in the driveway. She went outside and observed keys in the ignition and Pendino's hat on the ground nearby. Sensing something was wrong, she called the police, who arrived shortly after 7:20 a.m. After officers

---

[2] References in the form of "Tr. __" herein are to the transcript of the trial proceedings before the state trial court.

noticed apparent blood spots on the driver's side of Pendino's vehicle and what appeared to be blood spattered on the gravel next to Pendino's car, and on nearby weeds and trees, they secured the area and called for additional assistance from the Newburgh Police Department and the New York State Major Crimes Unit.

A thorough investigation of the scene revealed clear evidence of foul play. Detectives found a 71-foot trail of blood droplets leading from Pendino's driveway to a large pool of blood in the backyard. From that location, a second, heavier blood trail continued to the driveway belonging to the house next door. The blood, which was still wet when the officers arrived, matched Pendino's DNA. State witness Dr. Barbara Wolf explained at trial that based on her expertise, the blood pattern was caused by a massive injury to the head inflicted by a blunt instrument such as a baseball bat or blackjack. The blood pooling indicated that Pendino's head must have been in contact with the ground for at least some amount of time along the blood trail.[3] Officers recovered Pendino's blood-stained pager near the driveway, along with a pair of eyeglasses.

---

[3] Defense expert Dr. Herbert McDonnell similarly testified that the blood trail was consistent with two persons having carried a person who had been struck in the head with a baseball bat or blackjack, while defense expert Dr. Mark Taff testified that

Police informed Ronsini of Pendino's disappearance that same day. He told police and testified at trial that Chrysler had become preoccupied with discovering and punishing the "rat" who had supplied the police with the information that led to his and his wife's arrests in August 1998. Ronsini testified that a few days after those arrests, Chrysler left a message on Ronsini's answering machine stating: "[W]e know it was[] you[,] fuckin' rat. Don't leave your house." Tr. 1512.[4] Paul Petrillo, another acquaintance of Chrysler's, also testified about a conversation he had with Chrysler during the fall of 1998 at Champion's Tavern, a Newburgh bar. Chrysler was "highly agitated" because "somebody ratted on him." Tr. 498A.

In early October, Chrysler called Ronsini again. Unbeknownst to Chrysler, Ronsini was with Petrillo, who listened in on the call. Ronsini recorded this conversation and gave a copy to police after learning of Pendino's disappearance. *See* People's Exhibit 1 (second recording). During the October 1998 conversation (which was played for the jury at trial), Ronsini asked Chrysler if he really thought that Ronsini was the informant, and Chrysler demurred.

he could think of only three types of injuries that would cause the blood pattern found at the scene: blunt force trauma, a gunshot wound, or a stab wound.

[4] The taped message, which was played for the jury at trial, reflects slightly different phrasing: "We know it was you, you fuckin' rat. Stay in your fuckin' house." People's Exhibit 1 (first recording).

Chrysler then identified Pendino as possibly the informant. He said that the informant had been at his house the night he was arrested, and noted that Pendino was among the people there. Chrysler stated: "I'm gonna tell you something so you understand me right now. Okay. You can never bring me in front of Dom because he was at my house." People's Exhibit 1 (second recording) at 8:04-8:10. After mentioning the names of others who were at his house on the night of his arrest, Chrysler said: "These people are just scum bags and I'm gonna tell you what. One of them is a fucking rat. One of them was at my fucking house that night. One person out of them is a rat." People's Exhibit 1 (second recording) at 14:20-14:28. Chrysler expressed his anger: "I am fucking mad as fucking hell." He emphasized: "They arrested my fucking wife. I'm not letting this fucking go." People's Exhibit 1 (second recording) at 15:38-15:41.

Petrillo testified that months later, in mid-to-late February 1999, he again ran into Chrysler at Champion's. Chrysler told him that "he had a good idea who ratted on him," and that he was "going to take care of [the rat]." Tr. 489. Andre Baynes, another acquaintance of Chrysler's, also testified that during mid-February 1999 he saw Chrysler at Champion's. Baynes said that he went to Champion's with Pendino, and as he and Pendino were arriving at the bar,

8

Chrysler "stepped outside and wanted to talk to" Pendino. Tr. 2076. Baynes "went inside and watched through the window," at which point he saw Chrysler angrily pointing his finger in Pendino's face from about a foot away. Tr. 2076-77. Pendino was "shaking his head, like, he was saying no to something." Tr. 2077.

Other evidence closely linked both Chrysler and his co-defendant, Weygant, with the crime scene.[5] First, the glasses found in the driveway of Pendino's home (which, despite the fact that dew covered the surrounding area, were dry when found, suggesting that the glasses had only recently been left there) were determined to belong to Chrysler. Paul Utnick, a licensed optician in nearby Monroe, New York, testified that the glasses, which were found damaged (bent in the middle) on the driveway beside Pendino's car, were of the same type as a pair of Izod Lacoste glasses purchased by Chrysler on September 24, 1998. The prescription of the glasses, moreover, was identical to Chrysler's

---

[5] Testimony from multiple witnesses at trial established that Weygant was both a close associate of Chrysler's and that he was heavily involved in Chrysler's marijuana business. For instance, Weygant's former girlfriend, Salvatriece Ferretti, testified that Weygant stored packages of marijuana at her apartment while he was living there, and that she had accompanied him on trips, sometimes joined by Chrysler, to deliver the marijuana and collect payment. She testified that Chrysler specifically wanted to use her car on these occasions, that she had observed both Chrysler and Weygant handle a marijuana package, and that as Chrysler and Weygant were leaving the locations that they visited, she observed each on various occasions counting bills. During these trips, she also heard Chrysler make comments such as "so and so is getting in a lot over his head." Tr. 2119.

prescription, and Chrysler's DNA was identified on swabs taken from the glasses themselves.

In addition, substantial evidence connected cars driven by both Chrysler and Weygant to Pendino's murder. Barry Greenfield, the owner of Riverside Tire and Auto, where Chrysler worked, testified that on March 2, 1999, the day before Pendino's disappearance, Chrysler told Greenfield that he was having trouble with one of his cars and asked to borrow a four-door maroon Ford Crown Victoria that Greenfield kept around the shop and often drove. Greenfield said that he agreed to loan Chrysler the Crown Victoria, and Chrysler drove off in it later that day.

Pendino's neighbor, Thomas Candrelli, testified that early on the morning of March 3, 1999, the day of Pendino's disappearance, he had a strange encounter with a maroon four-door sedan. As he was pulling out of the cul-de-sac on which his house was located (onto a street to which a cul-de-sac leading to the Pendino home also connected), a maroon car with no lights on suddenly appeared, causing Candrelli to slam on the brakes to avoid hitting it. Candrelli followed the maroon car closely for a time, before pulling around it and never seeing it again. Candrelli told police later that day that the maroon car looked

like an undercover police vehicle. (Greenfield's employee confirmed that Greenfield's Crown Victoria was in fact an "old police car." Tr. 630.) Candrelli said that he thought that the car he saw might have been a Chevrolet Caprice, a Classic Mercury Grand Marquis, or a Ford Crown Victoria.

Abraham Warner, a Riverside Tire and Auto employee who worked with Chrysler, testified that later that morning, at about 8:05 a.m., Chrysler arrived at Riverside in the Crown Victoria and asked Warner to clean out red paint that he had spilled in the back of the car on his way to work. Warner did so. Greenfield testified that Chrysler initially said nothing to him about spilling paint in the car. The next day, however, when Greenfield asked why his vehicle's windows were fogged up (apparently as a result of Warner's cleaning), Chrysler claimed that paint he had obtained for the auto shop's alignment machine had spilled while he was transporting it. Police seized the Crown Victoria from Greenfield's residence pursuant to a warrant on March 6, three days after the crime. Despite Warner's cleaning, forensics investigators found stains in the back seat of the vehicle. Chemical screenings confirmed that the stains were blood, and forensic analysis established that they contained Pendino's DNA.

11

Chrysler's own vehicle, a Toyota 4-Runner, was also linked to Pendino's murder. Warner testified that on the afternoon of March 3, after Chrysler had arrived at work in the Crown Victoria, Weygant arrived at Riverside driving Chrysler's car. Warner saw Weygant exit the car and go into the office. Soon thereafter, Weygant and Chrysler came out together and asked him to clean spots of blood off of the car's seat and seat belts. Weygant told Warner that Weygant and a friend got in a fight when they were in a bar in New York City, and that his friend had dripped blood from his hand onto the back seat and seat belts. Warner testified that he cleaned the 4-Runner in response to the pair's request.

Police seized the vehicle from Chrysler's house pursuant to a search warrant on March 6, the same day they seized the Crown Victoria. Warner testified that when he cleaned the car on March 3, it had a full complement of seatbelts. But when police seized the vehicle, the rear seatbelts had been removed and only stubs remained. Further, when the 4-Runner was examined for trace evidence, eighteen blood stains were still present, including stains on the rear passenger-side seat and on a tag from one of the rear passenger-side seatbelt stubs. Swabs from the blood stains matched Pendino's DNA. Detectives

also found three green latex gloves with reddish-brown stains in the rear cargo area of the car. DNA testing of the gloves established that the stains matched Pendino's DNA, and also that another person's DNA was present. Examiners noted that the DNA belonging to the unidentified individual contained an allele at one locus that occurs in less than one in thirteen Caucasians. Evidence at trial established that Weygant possesses this allele.

The prosecution's theory at trial was that Chrysler and Weygant used the 4-Runner not only to transport Pendino's body, but also, in the days leading up to March 3, to dig a ditch in which the body (which was never found) was ultimately disposed. Several pieces of evidence supported this theory. For instance, Warner testified that Chrysler had also directed him to clean his 4-Runner a couple of days *before* Pendino's disappearance on March 3. The car's running boards were covered with mud, there was some mud inside the car, and the seats were covered with plastic bags. Warner, who frequently cleaned Chrysler's 4-Runner, had never seen it in that condition; it was usually "[i]mmaculate." Tr. 587. Warner also testified that he lent Chrysler a shovel days before the murder occurred. In addition, Greenfield testified that sometime

13

shortly before March 2, Chrysler requested a bale of hay (supposedly for a friend planting shrubs), which Greenfield provided to him.

**B. Ferretti's Trial Testimony and Weygant's Grand Jury Testimony**

The prosecution elicited additional inculpatory testimony from Weygant's former girlfriend, Salvatriece Ferretti ("Ferretti"). She testified that in the weeks after the crime, as suspicion focused on Chrysler and Weygant, she overheard Chrysler ask Weygant if anyone saw him, to which he responded "no." Tr. 2150. Chrysler asked Weygant if he was wearing his boots and Weygant responded that he burned them. Chrysler said that he had shredded his own boots by running them through a compressor. Chrysler also asked Weygant if he was "doing that thing with [his] fingernails like [Chrysler] told [him] to." Tr. 2150. Weygant said that he was. Tr. 2150-51. Previously, Ferretti had noticed Weygant obsessively cleaning his nails and he had asked her to give him a manicure. Ferretti also testified that a few days before the crime, Weygant asked about a blackjack that he had given her on a previous occasion, and she suggested that he may have subsequently taken the blackjack from her car.

Ferretti related several more statements made by Weygant in the aftermath of the murder, including two separate statements in which he admitted to

14

committing it. Before trial, the State announced its intention to have Ferretti testify about these admissions; it also gave notice that it intended to offer at trial statements made by Weygant before the grand jury, attaching the transcript of that testimony. In response, Chrysler's trial counsel filed a motion to sever Chrysler's trial from Weygant's. The motion stated that "[t]he People have served notice of intent to offer the admissions of co-defendant W[ey]g[ant]"; that Weygant "has testified before the Grand Jury which testimony has been held to be admissible in this State"; and that "the Confrontation Clause bars the introduction of a confession of a nontestifying co[-]defendant, not directly admissible against the defendant, that inculpates the defendant." J.A. 177. It argued that Ferretti's testimony regarding Weygant's statements would raise Confrontation Clause issues under *Bruton v. United States*, 391 U.S. 123 (1968). While Judge Berry initially denied the motion with leave to renew, he later said during a pretrial conference that he would grant Chrysler a separate trial if he were to request one. Chrysler's trial counsel, however, announced that Chrysler and Weygant, together with their attorneys, had decided to proceed with a joint trial. Judge Berry specifically asked Chrysler whether he understood that "certain statements which are alleged by Ms. Ferretti to have been made to her

15

by Mr. Weygant, as well as, certain things she's overheard between you and Mr. Weygant . . . would come into evidence" in a joint trial. J.A. 376. Chrysler said yes. The judge then asked Chrysler whether he understood that he would be afforded a separate trial if he were to ask for one. Chrysler said yes. Chrysler further affirmed that he understood that "*the evidence that pertained to Mr. Weygant* would not be coming into th[e] [severed] case with regard to [Chrysler]"—and that he had spoken with his attorney "[f]ully" about his decision.[6] J.A. 376-78 (emphasis added). Nonetheless, Chrysler affirmed his desire for a joint trial. As Chrysler's attorney put it during the proceeding, "[w]e on the Chrysler-Weygant team want to be together. We want to stand together and fight together." J.A. 375.

Ferretti testified at trial that Weygant admitted his involvement in Pendino's murder to her on two separate occasions. First, on April 9, 1999, a little more than a month after the crime, she went to dinner at a French restaurant called L'Air De Paris with Weygant, Chrysler, and Chrysler's wife

---

[6] The State subsequently advised the court that it planned to offer two additional statements made by Weygant: one to Ronsini and one to Robert Herring, an individual who ultimately did not appear as a witness in the case. After hearing about the planned testimony, Chrysler again affirmed his desire to proceed with a joint trial, personally assuring the trial court that he desired a joint trial and that he had enjoyed "ample opportunity" to consult with his attorneys on the subject. J.A. 408-09.

Elizabeth. She said that after the dinner, Weygant and Chrysler got into an argument about the bill. She and Weygant hastily left, and Weygant told her: "I just killed a kid for that guy and he can't even fuckin' buy me dinner." Tr. 2160. At that point, however, Weygant told her that he had killed Pendino on his own, without Chrysler's help.[7] Weygant made a second, more detailed statement on April 24, 1999, while he and Ferretti were spending a weekend in New Paltz, New York. While they were there, Ferretti pressed Weygant for the truth about Pendino's murder. He told her that on March 2, the night before the murder, he stayed at Chrysler's house. They left at 4:00 a.m. and got Greenfield's car in Walden, New York. Weygant drove from Walden back to Newburgh, where he picked up someone he referred to as his "special friend." Tr. 2173. They "w[h]acked" Pendino with a baseball bat, and afterwards Weygant dropped the "friend" off in Newburgh before driving back to Walden, where "he switched the body from [Greenfield's] car to the 4-Runner and then . . . went to go bury the body." Tr. 2173-75.

---

[7] Indeed, when Ferretti pressed him on this point, asking how he explained the fact that Chrysler's glasses were found at the scene, Weygant claimed he had stolen the glasses from Chrysler and left them there himself. Tr. 2161.

When the State sought to have Weygant's grand jury testimony read to the jury at trial, Chrysler's attorney stated that he had no objection. (That grand jury testimony, like Ferretti's testimony regarding Weygant's admissions, was received without any instruction that it was admitted as to Weygant alone—and indeed without any request for such instruction.) In his testimony, Weygant denied involvement in both Pendino's death and the marijuana business, but he admitted to being friends with Chrysler, and he recounted conversations in which Chrysler told him that he had been arrested and charged in an earlier drug case because one of his associates had "ratted him out." According to Weygant, this subject—the "rat"—"came up a lot" in conversations with Chrysler. J.A. 760. Weygant admitted that Chrysler had discussed the possibility that Pendino was the informant, but he stated that based on his conversations with Chrysler, it was evident that Chrysler primarily suspected Ronsini.

The State also asked Weygant if he had ever gone to the French restaurant L'Air De Paris with Chrysler, Chrysler's wife, and Ferretti. Weygant said yes, but he denied admitting to any role in Pendino's murder after the meal. Weygant also confirmed that he and Ferretti had spent a weekend in New Paltz, but denied confessing to Ferretti on that occasion as well.

18

Weygant also testified that he had possessed a blackjack, that he had given a blackjack to Ferretti, and that she told him that she thought the blackjack he had given her was stolen from her car. When asked if he had ever told Ferretti that he was digging a ditch, Weygant stated that he had, but explained that he had been talking about a ditch he had helped dig at his brother's house. He said that Chrysler had stopped by several times while Weygant and his brother were digging, but that Chrysler had not helped or provided any tools for the job.[8] The State also asked if Weygant had ever discussed Chrysler's eyeglasses with anyone. Weygant responded that he and Chrysler had once gone to an eyeglasses store in Monroe and discussed the glasses with Utnick.[9] Finally, Weygant was asked if he had ever driven Chrysler's Toyota 4-Runner, and more specifically if he had driven it to Riverside Tire and Auto on the day that

---

[8] Ferretti testified at trial that during a phone call on March 2, the day before the murder, Weygant remarked on a conversation he had with Chrysler earlier that day in which Chrysler observed Weygant swinging a pick and a shovel. Ferretti testified that she later directly asked Weygant about digging a ditch with Chrysler and that in response he grabbed her by the throat, slammed her down, and without specifying whether he and Chrysler had dug a ditch, told her "we will never have this conversation again." Tr. 2157.

[9] Ferretti had earlier testified that in the aftermath of the crime, Weygant told her that police had found a pair of glasses at the scene, traced them to a store in Monroe and to Chrysler, and that Chrysler "was going to try and say that he had lost the glasses; that the glasses were being returned to him by [Pendino]," but that Weygant "didn't believe it." Tr. 2156.

19

Pendino went missing. He responded that he "might have driven" the 4-Runner on one occasion, J.A. 771, and confirmed that he had been to Riverside Tire and Auto on March 3, 1999, although he said that his sister had driven him there in his mother's car.[10]

During summation, the State emphasized that its case against Chrysler— which included the DNA evidence found in his car and a car he had borrowed, his glasses recovered from the crime scene, and the voice recordings in which he angrily talked about the "rat" who had informed on him—was "overwhelming." Tr. 3450. The prosecutor cited Weygant's grand jury testimony on more than one occasion, but principally to corroborate other evidence against Weygant, particularly Ferretti's testimony. During the prosecution's summation, Chrysler's counsel did not object to the use of Weygant's grand jury testimony on Confrontation Clause grounds, and registered only a limited objection to the way the prosecution was presenting Weygant's grand jury testimony that is not relevant for purposes of this appeal.[11]

---

[10] While Weygant initially responded affirmatively to the question whether he had been "to the Riverside Tire & Auto center in that vehicle," his later statements that his sister had driven him there in his mother's vehicle suggested that he did not intend to state that he had been to Riverside Tire and Auto in the 4-Runner. J.A. 772-73.

[11] Chrysler's counsel argued that "a curative instruction [wa]s required to avoid any sense among the jurors that" the prosecutor, who conducted the grand jury

20

**C. State Post-Conviction Proceedings**

On July 13, 2000, the jury returned a verdict convicting Chrysler and Weygant on all counts. On direct appeal, Chrysler raised a variety of arguments. He argued that prosecutorial misconduct mandated reversal, that the trial court made a number of evidentiary errors, that the court's refusal to give a circumstantial evidence charge requested by the defense was erroneous, and that there was insufficient evidence to sustain his murder conviction. Chrysler also asserted that because Ferretti's testimony implicated his Confrontation Clause rights under *Bruton*, his trial counsel had been ineffective for, *inter alia*, failing to object on hearsay and Confrontation Clause grounds to Ferretti's testimony and not seeking to sever Chrysler's trial from Weygant's. Chrysler later submitted a supplemental brief raising a new argument that the State had failed to establish chain of custody for a toothbrush that was used as a source of Pendino's DNA. The Second Department rejected all of Chrysler's claims. *People v. Chrysler*, 787 N.Y.S.2d 365, 365-66 (App. Div. 2004).

---

proceedings, "would become effectively an unsworn witness" by stating that he had asked Weygant certain questions when Weygant appeared before the grand jury. Tr. 3391. After discussion with counsel for both sides, the court agreed to instruct the jury to draw their own inferences and conclusions based on the evidence. Judge Berry reminded the jurors that "[a] summation is merely the attorney's belief of what has been proven in this case" and invited the jurors to re-examine Weygant's grand jury testimony for themselves. Tr. 3399-3400.

After his conviction was affirmed on appeal, Chrysler filed a motion to vacate his conviction pursuant to New York Criminal Procedure Law § 440.10 in May 2005. Chrysler raised two grounds for relief. First, he again advanced the argument that his trial counsel Bruce Cutler had rendered ineffective assistance by encouraging him not to accept a severance. Had Chrysler stood trial alone, the jury would not have heard either Ferretti's account of Weygant's statements or Weygant's grand jury testimony, which were inadmissible against Chrysler. Second, Chrysler argued that the admission of Weygant's grand jury testimony violated the New York Constitution and the Sixth Amendment's Confrontation Clause pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004). The trial court denied Chrysler's § 440.10 motion on September 30, 2005, holding that both his claims were procedurally barred: the former claim had already been raised on direct appeal (and in any case lacked merit), and the latter claim *could have* been raised on direct appeal. Chrysler sought leave to appeal from the Second Department, arguing that the lower court had erroneously found his *Crawford* claim procedurally barred since the issue "had not been preserved for direct appeal and Chrysler therefore could not have raised it." J.A. 1186. On

22

November 30, 2005, the Second Department summarily denied Chrysler's application.

On October 16, 2006, Chrysler filed a petition for a writ of coram nobis with the Second Department. He claimed for the first time that his *appellate* counsel had been ineffective in failing to raise on direct appeal a *Crawford* claim relating to the introduction of Weygant's grand jury testimony. The Second Department denied Chrysler's petition, stating simply: "The appellant has failed to establish that he was denied the effective assistance of appellate counsel." *People v. Chrysler*, 37 A.D.3d 486, 487 (N.Y. App. Div. 2007) (citing *Jones v. Barnes*, 463 U.S. 745 (1983); *People v. Stultz*, 778 N.Y.S.2d 431 (2004)). On June 15, 2007, the New York Court of Appeals denied Chrysler leave to appeal.

**D. Proceedings Below**

Chrysler filed the instant habeas petition in the United States District Court for the Western District of New York. As relevant here, the petition argues that Chrysler's appellate counsel acted ineffectively by not raising a *Crawford* claim involving Weygant's grand jury testimony on direct appeal. The case was transferred to the Southern District of New York on October 1, 2007, and was eventually assigned to Judge Karas. The district court held that Chrysler's claim

23

of ineffective assistance of appellate counsel had been exhausted via Chrysler's coram nobis petition, and that it could be reviewed on federal habeas because the Second Department had denied the claim on its merits. *Chrysler*, 14 F. Supp. 3d at 455-57. However, the court determined that the Second Department's denial of the claim was not "an unreasonable application of the law defining the federal constitutional right to effective assistance of appellate counsel." *Id.* at 457. It held that under the two-pronged test governing such claims, the Second Department reasonably could have concluded either (1) that Chrysler's counsel's performance was not objectively unreasonable or (2) that there was no "reasonable probability" that any error on counsel's part affected the outcome of Chrysler's direct appeal. *See id.* at 457-62 (*citing Strickland v. Washington*, 466 U.S. 668 (1984)). The district court reasoned that neither *Strickland* prong was satisfied because "[Chrysler's] trial counsel failed to object to the admission or use of Weygant's grand[ ]jury testimony at trial," so any *Crawford* claim based on that testimony was unpreserved. *Id.* at 459.

Though it expressed confidence in its reasoning and conclusion, the district court nevertheless granted Chrysler a certificate of appealability ("COA") limited to the following question:

24

[W]hether Petitioner's right to the effective assistance of appellate counsel was violated when that counsel did not raise his Confrontation Clause claim on appeal in a way that would have allowed the Court to decide whether Petitioner's Confrontation Clause rights were violated.

*Id.* at 462.[12] Chrysler filed a timely notice of appeal from the district court's decision on April 28, 2014.

## DISCUSSION

We review a denial of a petition for a writ of habeas corpus de novo. *Jones v. West*, 555 F.3d 90, 95 (2d Cir. 2009).

## I.

Federal habeas corpus law generally gives state courts the first opportunity to address state prisoners' claims that their custody violates federal law. *See Ex parte Royall*, 117 U.S. 241, 247-48 (1886); *see also* 28 U.S.C. § 2254(b)(1) (requiring exhaustion of state remedies unless such remedies are unavailable or circumstances render them ineffective). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") also obliges federal courts to give deference to

---

[12] Chrysler's appellate counsel did not argue on appeal either: (1) that Chrysler's Confrontation Clause rights were violated by the admission at trial of Weygant's grand jury testimony; or (2) that Chrysler's trial counsel had been ineffective for failing to preserve this Confrontation Clause claim. As the district court recognized, however, Chrysler has not argued here that his appellate counsel was ineffective for failing to make the latter argument, nor has this claim been exhausted. *Chrysler*, 14 F. Supp. 3d at 461-62. Accordingly, we do not address it further.

state courts' decisions: for claims that have been "adjudicated on the merits" in state court, a federal court may not issue a writ of habeas corpus unless, as relevant here, the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  *Id.* § 2254(d)(1).

Chrysler adequately exhausted the ineffective assistance claim he raises in this case by "fairly present[ing]" it to the Second Department in his coram nobis petition, *Daye v. Att'y Gen. of N.Y.*, 696 F.2d 186, 191 (2d Cir. 1982) (en banc), and then seeking leave to appeal to the New York Court of Appeals, *see O'Sullivan v. Boerckel*, 526 U.S. 838, 839-40 (1999).  Although the Second Department ruled on Chrysler's claim in summary fashion, summary dispositions rank as adjudications "on the merits" for AEDPA purposes unless the petitioner provides "reason to think some other explanation for the state court's decision is more likely."  *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011).  Chrysler does not dispute that the Second Department adjudicated his ineffective assistance claim "on the merits," or that AEDPA's deferential standard applies as a result.

"[Section] 2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning."  *Bell v. Cone*, 535 U.S. 685, 694 (2002).  A state

26

court's decision is "contrary to" clearly established federal law "if the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Id.* By contrast, a state court engages in an "unreasonable application" of clearly established federal law if it "correctly identifies the governing legal principle from [the Supreme Court's] decisions but unreasonably applies it to the facts of the particular case." *Id.* Here, only the "unreasonable application" clause of § 2254(d)(1) is at issue because the Second Department's decision properly cited *Jones v. Barnes*, 463 U.S. 745 (1983), the most relevant Supreme Court case governing ineffective assistance of appellate counsel, and the facts of this case are distinguishable from any case decided by the Supreme Court. *See Chrysler*, 37 A.D.3d at 487 (citing *Jones v. Barnes*, 463 U.S. 745 (1983)); *see also, e.g.*, *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000) ("[T]he Appellate Division cited *Jones* [*v. Barnes*] in its summary disposition denying [the] *coram nobis* petition, and accordingly invoked the correct legal principle at issue. This places our review of the denial of [the] habeas petition squarely within the 'unreasonable application' prong of § 2254(d)(1).").

27

Under *Strickland v. Washington*, in order to demonstrate ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner must show (1) that his counsel's representation "fell below an objective standard of reasonableness," and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). *Strickland*'s "general standard for ineffective-assistance-of-counsel claims" supplies the relevant clearly established law for AEDPA purposes if there is "no other Supreme Court precedent directly on point." *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). With respect to claims of ineffective assistance of appellate counsel, the Supreme Court has also held, as relevant here, that "appellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (describing *Barnes*, 463 U.S. 745); *see also Lynch v. Dolce*, 789 F.3d 303, 319 (2d Cir. 2015). We evaluate the Second Department's decision against these clearly established principles.

Under AEDPA's "unreasonable application" clause, our review is extremely deferential: "[a] state court's determination that a claim lacks merit

precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Where, as in this case, the state court does not provide reasons for its decision, we examine "what arguments or theories . . . *could* have supported" that decision, and then "ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102 (emphasis added). The range of reasonableness "depend[s] in part on the nature of the relevant rule." *Yarborough*, 541 U.S. at 664. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* "The *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Harrington*, 562 U.S. at 105. Accordingly, as a result of the interaction between AEDPA and *Strickland*, the question before us—as Chrysler acknowledges—becomes "whether there is any reasonable argument that [Chrysler's] counsel satisfied *Strickland*'s deferential standard," in which case the district court correctly denied Chrysler's petition. *Id.; see* Appellant's Br. at 18.

29

## II.

We begin by considering the nature of the alleged Confrontation Clause violation underlying Chrysler's ineffective assistance claim. The Sixth Amendment guarantees every criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. In *Crawford v. Washington*, the Supreme Court interpreted this Clause to bar the admission at trial of a witness's "testimonial evidence"—which includes "at a minimum" his "prior testimony . . . before a grand jury"—unless the witness is unavailable and the defendant has been afforded a prior opportunity for cross-examination. 541 U.S. 36, 68 (2004). The Supreme Court decided *Crawford* while Chrysler's case was pending on direct appeal, and New York appellate courts have applied its holding on direct appeal where trial counsel timely objected to the use of evidence as violating a defendant's Confrontation Clause rights. *See People v. Hardy*, 791 N.Y.S.2d 513, 517 (2005) ("Because this appeal was not yet final at the time the Supreme Court decided *Crawford*, defendant is entitled to invoke *Crawford*, and we are compelled to apply it . . . ."). Because Chrysler did not receive an opportunity to cross-examine Weygant, and the record contains no indication that the grand jury testimony was admitted only against Weygant, we

30

assume that the admission of that testimony (like the admission of Weygant's statements to Ferretti) implicated Chrysler's Confrontation Clause rights.

This only begins the analysis pertinent here. The mere fact that Chrysler's Confrontation Clause rights were implicated by the admission of Weygant's grand jury testimony does not mean that his rights were *violated* by the admission of this testimony (since his trial counsel expressly stated that he had no objection to its admission). Nor has Chrysler shown by the mere admission of the grand jury testimony that his appellate attorneys acted unreasonably in not raising a *Crawford* claim based on that testimony, or that Chrysler was prejudiced by their failure to do so. Because the reasonableness of appellate counsel's decision not to raise a *Crawford* claim depends in part on whether that claim would have succeeded, *see Barnes*, 463 U.S. at 751-53, we first assess the likelihood that the Second Department would have reversed Chrysler's conviction on direct appeal had his appellate attorneys raised such a claim. In other words, we address *Strickland*'s second prong first, applying AEDPA's deferential standard, before turning next to the objective reasonableness of appellate counsel's representation.

As to *Strickland*'s second prong, we conclude that a fairminded jurist could determine that there was no "reasonable probability" that the Second Department would have reversed Chrysler's conviction on direct appeal even if his appellate counsel had raised a *Crawford* claim based on Weygant's grand jury testimony. *See Lynch*, 789 F.3d at 319 (asking whether "fairminded jurists could disagree as to whether there is a reasonable probability that, had counsel raised the . . . issue, the outcome of the appeal would have been different"). Importantly, as the district court correctly observed, any such claim was not preserved for appellate review. Under New York law, a defendant does not preserve a Confrontation Clause claim unless he specifically objects to the introduction of the relevant evidence on constitutional grounds. *See, e.g., People v. Lopez*, 808 N.Y.S.2d 648, 649 (App. Div. 2006) (finding Confrontation Clause claim unpreserved even where defendant raised a hearsay objection to the same evidence); *People v. Bones*, 793 N.Y.S.2d 545, 546 (App. Div. 2005) (finding Confrontation Clause claim unpreserved where defendant "failed to object with any specificity" that the evidence in question "violated his Sixth Amendment right to confront witnesses against him"). Moreover, New York courts "have

applied the preservation requirement to deny a direct appeal where a defendant was convicted before the Supreme Court decided *Crawford*, attempted to assert rights under *Crawford* on appeal, but did not assert those rights at trial." *Chrysler*, 14 F. Supp. 3d at 460-61 (citing *Bones*, 793 N.Y.S.2d at 546); *cf. United States v. Botti*, 711 F.3d 299, 308-10 (2d Cir. 2013) (under Federal Rule of Criminal Procedure 52(b), the plain error standard applies even if applicable law changes between trial and appeal). Here, Chrysler's trial counsel did not merely fail to register a specific objection to the admission of Weygant's grand jury testimony; he went so far as to state specifically that he had no objection—even though, long before *Crawford*, the testimony would have constituted hearsay as to Chrysler, thus raising Confrontation Clause concerns. *See infra* note 13. As a result, Chrysler's *Crawford* claim was unpreserved, and had it been raised on appeal, the Second Department would have been under no obligation to consider it.

To be sure, New York's intermediate appellate courts are permitted to reach unpreserved issues "[a]s a matter of discretion in the interest of justice." N.Y. Crim. Proc. Law § 470.15.3(c). Chrysler argues that had his appellate counsel raised a *Crawford* claim based on Weygant's grand jury testimony, there is a reasonable probability that the Second Department would have exercised its

33

interest-of-justice jurisdiction to hear that claim and reverse his conviction. But a fairminded jurist could comfortably reject this argument. Indeed, as explained below, several factors were present here that render it exceedingly unlikely that the Second Department would have entertained Chrysler's *Crawford* claim.

First, New York intermediate appellate courts exercise their discretionary interest-of-justice jurisdiction only to correct errors that are "so egregious that [they] deprive[d] [the] defendant of a fair trial." *People v. King*, 482 N.Y.S.2d 924, 925 (App. Div. 1984); *see* N.Y. Crim. Proc. Law § 470.15.6(a). As relevant here, courts have declined to exercise interest-of-justice jurisdiction where there is overwhelming evidence of the defendant's guilt. *See, e.g.*, *People v. Benton*, 771 N.Y.S.2d 622, 623 (App. Div. 2004) (concluding that reversal in the interest of justice was not warranted even assuming a jury instruction was erroneous where there was "strong evidence of guilt"); *People v. Belgrave*, 580 N.Y.S.2d 481, 482 (App. Div. 1992) (declining to exercise "interest of justice jurisdiction to review the defendant's claim given the overwhelming evidence of the defendant's guilt"). Such was the case here. Glasses belonging to Chrysler were found at the scene of the crime, and blood stains matching Pendino's DNA were discovered in Chrysler's car—from which blood-stained seatbelts had conveniently

34

vanished—and in the car he was driving on the day of the crime. Chrysler lied about the source of these red stains and pressed Warner to clean both vehicles on the very day that Pendino disappeared. The prosecution also adduced testimony from multiple witnesses that Chrysler sought revenge against the "rat" who had provided information leading to his earlier arrest. A taped phone conversation was played for the jury in which Chrysler discussed Pendino as a potential suspect and vented his rage. A fairminded jurist could well conclude, under these circumstances, that Chrysler's *Crawford* claim would have made no difference on direct appeal because it would not have been considered.

Along similar lines, even assuming that the Second Department would have entertained the claim on direct appeal, a fairminded jurist could also perceive no reasonable probability of that court's failing to find any *Crawford* error harmless beyond a reasonable doubt. Applying the constitutional standard for harmless error, New York courts dismiss Confrontation Clause errors as harmless "when, in light of the totality of the evidence, there is no reasonable probability that the error affected the jury's verdict." *People v. Douglas*, 793 N.Y.S.2d 825, 826 (2005); *see also People v. Ayala*, 554 N.Y.S.2d 412, 416 (1990) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). A fairminded jurist could

easily find that standard satisfied here. The grand jury testimony was used primarily to corroborate Ferretti's testimony against Weygant, and it implicated Chrysler only tangentially—by suggesting, for instance, that Chrysler thought an associate had "ratted him out." Further, as the prosecution emphasized throughout its summation, Weygant's testimony was duplicative of other evidence and was by no means the only source corroborating Ferretti's testimony, which was also supported by testimony from several witnesses and by forensic evidence. The small part that Weygant's testimony played in the case against Chrysler thus amply supports the conclusion that there was no chance his testimony affected the jury's verdict.

This factor sharply distinguishes this case from *People v. White* (relied on by Chrysler), which held that the erroneous admission of fifteen co-defendants' plea allocutions was not harmless beyond a reasonable doubt where the prosecution described that evidence as "'essential,' 'the most compelling evidence of the existence of a conspiracy,' and 'the core to the case.'" 809 N.Y.S.2d 90, 91 (App. Div. 2005). Instead, the circumstances of this case are analogous to many other cases where New York appellate courts have determined that similar errors *were* harmless in light of the strength of the other

36

evidence against the defendant. *See, e.g.*, *People v. Taylor*, 815 N.Y.S.2d 90, 91 (App. Div. 2006) (admission of testimony in violation of *Crawford* was harmless "because the other evidence supporting the jury's guilty verdict is strong"); *People v. Lopez*, 808 N.Y.S.2d 648, 649 (App. Div. 2006) (admission of co-defendant's written and stenographic statements as declarations against penal interest in violation of *Crawford* was harmless due to other "overwhelming evidence of defendant's guilt"); *People v. McBee*, 8 A.D.3d 500, 501 (N.Y. App. Div. 2004) ("overwhelming evidence of guilt" rendered any error harmless). Certainly, a fairminded jurist could find this analogy apt and thus conclude that there was no reasonable probability of Chrysler's appeal coming out differently—even if, contrary to the ordinary practice of New York intermediate appellate courts, the Second Department would have addressed the merits of Chrysler's unpreserved *Crawford* claim.

As noted, moreover, Chrysler's trial counsel specifically said that he had *no* objection to the admission of Weygant's grand jury testimony. This is yet another factor supporting the reasonable conclusion that the Second Department would not have exercised its interest-of-justice jurisdiction to review the unpreserved *Crawford* claim had appellate counsel raised it. Chrysler cites no

case, and we have not found one, in which a New York court exercised its interest-of-justice jurisdiction to overturn a conviction where trial counsel affirmatively consented to the admission of the challenged evidence. To the contrary, where counsel's acquiescence in the admission of evidence suggests an element of strategy as opposed to mere mistake, courts have viewed such acquiescence as grounds for *declining* to exercise interest-of-justice jurisdiction. *Cf. United States v. Olano*, 507 U.S. 725, 733-34 (1993) (under Rule 52(b), accidentally "forfeited" claims are reviewable on appeal for plain error, whereas intentionally "waived" ones are not). As one New York court has put it, where the trial court invited objection and counsel declined, and there was no question as to the sufficiency of the evidence as to guilt, the interests of justice did not require the appellate court to overlook the failure to object since it had "no way of knowing what prompted counsel to allow the . . . testimony to pass without objection," a decision that "might well" have been strategic. *People v. Cornish*, 349 N.Y.S.2d 694, 695 (App. Div. 1973); *see also People v. Brown*, 725 N.Y.S.2d 253, 254 (App. Div. 2001) ("[D]efense counsel affirmatively stated that he had no objection . . . . Consequently, defendant's contention is not preserved for our review, and we decline to exercise our power to review it as a matter of

discretion in the interest of justice." (citation omitted)); *People v. Hughes*, 655 N.Y.S.2d 29, 30 (App. Div. 1997) ("Defendant's claim that a limiting instruction should have been given is unpreserved, and we decline to review it in the interest of justice because defendant expressly waived such instruction." (citation omitted)); *People v. Wright*, 603 N.Y.S.2d 519, 520 (App. Div. 1993) ("[W]hen the certified transcript [of the defendant's grand jury testimony] was eventually offered into evidence, [she] expressly stated that she had no objection. Therefore, her present claim is unpreserved for appellate review and we decline to review it in the exercise of our interest of justice jurisdiction." (citation omitted)).

The fact that Chrysler's trial counsel expressly declined to object to the admission of Weygant's testimony thus made it less likely that the Second Department would have reviewed his *Crawford* claim on direct appeal. This is doubly true, moreover, because the context surrounding trial counsel's acquiescence in the admission of Weygant's grand jury testimony suggests that the decision was strategic. New York intermediate appellate courts have declined to exercise their interest-of-justice jurisdiction where "it appears that the defendant's counsel's failure to object was a matter of trial strategy." *People v. Doby*, 577 N.Y.S.2d 412, 413 (App. Div. 1992); *see also People v. Sprosta*, 853

39

N.Y.S.2d 625, 626 (App. Div. 2008) (interest-of-justice review of defendant's hearsay and Confrontation Clause arguments was "inappropriate" where defense counsel "expressly stated on the record that he had no objection to th[e] evidence" and "the record establish[ed] that defense counsel's express denial of any objection was part of an intentional defense strategy"); *People v. Eisemann*, 670 N.Y.S.2d 39, 40 (App. Div. 1998) (interest-of-justice review was not warranted where "the record indicate[d] that the defense counsel's failure to object . . . was actually a calculated tactical maneuver"). Such is the case here—or so a fairminded jurist could conclude.

Chrysler's pretrial motion to sever illustrates that his attorneys knew full well that Weygant's grand jury testimony would be offered at trial, and that it implicated Chrysler's Confrontation Clause rights. But Chrysler did not raise this issue again once he made the strategic decision to stand trial together with Weygant (knowing that Ferretti's testimony would be admitted). This suggests that the admission of the grand jury testimony could reasonably be viewed as an element of Chrysler's trial strategy, premised on turning Ferretti's testimony to his advantage. From the start, Chrysler's situation, given the strength of the evidence against him, was desperate. But Ferretti's testimony offered several

opportunities for the defense. Although Ferretti's testimony inculpated him, it also *exculpated* him, since Weygant claimed at L'Air De Paris that he had killed Pendino on his own, and implied in New Paltz that an unnamed "friend" other than Chrysler had been his accomplice. As Chrysler argued on direct appeal, Ferretti "testified that each and every time she attempted to induce defendant Weygant[] to implicate appellant, he categorically denied any involvement by Chrysler." J.A. 493. By opting for a joint trial with Weygant, Chrysler ensured that the Chrysler jury would hear Weygant's statements to Ferretti that Chrysler did not participate in the killing. During summation, Chrysler endorsed many of Ferretti's exculpating statements, calling them "admi[ssions]." Tr. 3303. Ferretti's testimony also gave Chrysler's trial counsel the opportunity, by attacking Ferretti's credibility, to distract the jury from the overwhelming evidence against Chrysler adduced from *other* sources—a tactic employed repeatedly during his summation. Weygant's grand jury testimony supported this attack on Ferretti's credibility because, for example (and as Chrysler stressed on direct appeal), Weygant explicitly denied ever confessing to Ferretti. *See* J.A. 443 n.19 ("In his own grand jury testimony, . . . Weygant denied any involvement in Pendino's disappearance or murder.").

41

To summarize, a fairminded jurist could conclude that Chrysler's *Crawford* claim would have made no difference on appeal because it would not have been considered. Multiple factors militated against the exercise of interest-of-justice jurisdiction: the other evidence of Chrysler's guilt was overwhelming; Chrysler's counsel affirmatively stated that he had no objection to the introduction of Weygant's grand jury testimony; and the record suggests that this decision was a matter of trial strategy. Even had the claim been considered, moreover, a fairminded jurist could conclude that the Second Department would have found the error harmless on appeal. Accordingly, the Second Department did not apply *Strickland* unreasonably in denying Chrysler's coram nobis petition.

## IV.

In light of the foregoing analysis, we similarly conclude that a fairminded jurist could also determine that Chrysler failed to satisfy the first prong of *Strickland* because his appellate counsel's representation did not fall "below an objective standard of reasonableness." 466 U.S. at 688. In *Jones v. Barnes*, the Supreme Court explained that appellate counsel need not raise every colorable claim on behalf of a client. 463 U.S. at 752-54. While it is of course possible, "[n]otwithstanding *Barnes*," to succeed on a *Strickland* claim based on counsel's

failure to press an argument on appeal, *Robbins*, 528 U.S. at 288; *see, e.g.*, *Lynch*, 789 F.3d at 319 (reversing denial of federal habeas on such a claim), the Supreme Court has cautioned that these claims are difficult precisely because "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal," *Robbins*, 528 U.S. at 288. Moreover, "[a] court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689). "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Id.* (quoting *Strickland*, 466 U.S. at 687). And in assessing whether *Strickland*'s first prong is satisfied, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689.

Adjudged by these standards, Chrysler has not shown that the Second Department's decision denying his coram nobis petition fell outside the range of reasonableness. As we explained in addressing *Strickland*'s prejudice prong, a fairminded jurist could conclude that there was no "reasonable probability" of

43

the Second Department's even reaching Chrysler's unpreserved *Crawford* claim on direct appeal. If that is so, then it follows that a fairminded jurist could conclude that Chrysler's appellate attorneys reasonably omitted such a claim to focus instead on claims that were properly preserved and that challenged more important sources of evidence than Weygant's grand jury testimony. *See, e.g.*, J.A. 436, 452 (arguing that the prosecution engaged in misconduct related to Ferretti's testimony); *id.* at 474-77 (arguing that the trial court improperly sustained objections to a series of attempts by defense counsel to confront Ferretti with impeaching evidence); *id.* at 500, 504, 506 (arguing that trial counsel was ineffective in failing to confront Ronsini and Ferretti with prior inconsistent statements, and in failing to object to testimony given by Dr. Wolf, the prosecution's blood expert); *id.* at 688-89 (arguing that the chain of custody for the source of Pendino's DNA was not properly established).[13] Moreover, there

---

[13] Chrysler contends that "there is no legitimate explanation for appellate counsel's failure to raise the *Crawford* claim on direct appeal" and suggests that counsel failed to bring the claim only because they were unaware that *Crawford* had been decided. Appellant's Br. at 13. This argument is unavailing. Although we, following Chrysler, refer to his argument regarding Weygant's grand jury testimony as a "*Crawford* claim," we doubt that the merits of his Confrontation Clause challenge to Weygant's testimony depended on *Crawford*. *See Ohio v. Roberts*, 448 U.S. 56, 67-68 (1980) (stating pre-*Crawford* "indicia of reliability" test); *United States v. Salerno*, 937 F.2d 797, 806-07 (2d Cir. 1991) (noting, before *Crawford*, that "reliability concerns . . . led courts to exclude grand jury testimony from use by the prosecution at trial"), *rev'd on other grounds*, 505 U.S. 317 (1992). There is no evidence in the record, moreover,

are additional considerations that made Chrysler's counsel's decision here all the more justifiable.

Critically, appellate counsel *did* challenge the fact that numerous statements made by Weygant raising Confrontation Clause concerns were admitted during the course of Chrysler's trial (albeit with Chrysler's consent).  In arguing that Chrysler was thereby denied his constitutional rights, however, counsel focused not on Weygant's grand jury testimony, but rather on Chrysler's decision to stand trial jointly with Weygant and, in particular, on Chrysler's acquiescence to the admission of *Ferretti's* testimony, which implicated Chrysler's Confrontation Clause rights under *Bruton*.[14]  Unlike Chrysler's so-called *Crawford* claim, the argument that trial counsel had been ineffective in

suggesting that Chrysler's appellate counsel failed to consider the *general* question whether to mount a challenge to the admission of Weygant's grand jury testimony based on the Confrontation Clause.

[14] By contrast, Weygant's grand jury testimony did not trigger the *Bruton* rule that "a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant." *Richardson v. Marsh*, 481 U.S. 200, 207 (1987).  Weygant neither confessed in the grand jury nor accused Chrysler of participating in the crime.  As the Supreme Court explained in *Richardson*, "[o]rdinarily, a witness whose testimony is introduced at a joint trial is not considered to be a witness 'against' a defendant if the jury is instructed to consider that testimony only against a codefendant."  *Id.* at 206.  Thus, even if Chrysler had objected to the admission of Weygant's grand jury testimony, a limiting instruction to the effect that the testimony was admissible only as to Weygant would have been adequate to address any Confrontation Clause concerns.

declining to seek a severance in light of Ferretti's testimony did not face dismissal on the ground that it was not raised below.

Given these factors, reasonable jurists could well conclude that Chrysler's appellate counsel did not act unreasonably in focusing not on the admission of Weygant's grand jury testimony, but instead on the Chrysler team's decision to stand trial jointly with Weygant notwithstanding the fact that the jury would thereby hear Ferretti's account of Weygant's confessions to her. While this argument still faced the obstacle that Chrysler had expressly affirmed his desire for a joint trial, it targeted a much more significant source of evidence against Chrysler. The importance of Weygant's grand jury testimony to the case against Chrysler pales in significance when considered next to Ferretti's testimony that, among other things, Weygant admitted to "just kill[ing] a kid for" Chrysler, to "w[h]ack[ing]" Pendino after spending the night with Chrysler and picking up Greenfield's Crown Victoria (which Chrysler had borrowed), and to moving Pendino's body from that car to Chrysler's 4-Runner before burying it. Tr. 2160, 2173.

To be clear, this is not to opine on the objective reasonableness of Chrysler's decision to stand trial with Weygant or his trial counsel's advice

46

regarding that decision—matters that are not before us. As we have explained, Chrysler faced a steep uphill battle in light of all the evidence against him, which established that he had a motive to kill Pendino, that his glasses had been found at the crime scene, that his car and a car he had borrowed were both stained with Pendino's blood, that he brought both cars to Warner for cleaning on the day of Pendino's disappearance, and that he lied about the source of the blood stains. Under these circumstances, it may well have been reasonable for Chrysler's trial attorneys to recommend a joint trial with Weygant, at which they could stress the exculpatory portions of Ferretti's testimony and then attack her credibility in an effort to distract the jury from the overwhelming evidence adduced from other sources.

Regardless, all of the foregoing demonstrates that Chrysler fell well short of the required showing that *any* fairminded jurist would conclude that his appellate counsel's omission of a challenge to the admission of Weygant's grand jury testimony—which Chrysler expressly acquiesced to at trial—"fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Accordingly, we conclude that the Second Department did not apply *Strickland* unreasonably

in rejecting Chrysler's coram nobis petition, and therefore that the district court correctly denied Chrysler's federal habeas petition.

## CONCLUSION

For the foregoing reasons, the district court's judgment is **AFFIRMED.**